172 So.2d 133 (1965)
BLUE BONNET CREAMERY, INC.
v.
GULF MILK ASSOCIATION, Inc.
No. 6279.
Court of Appeal of Louisiana, First Circuit.
February 1, 1965.
Rehearing Denied March 8, 1965.
A. Clayton James, Jr., of Johnson & James, Franklinton, for appellant.
Henry A. Mentz, Jr., of Mentz & Ford, Hammond, for appellee.
*134 Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.[*]
LANDRY, Judge.
The appeal herein is by Denis E. Simon, Jr., debtor, from the decree of the lower court rendered in a garnishment proceeding instituted by his judgment creditor, Blue Bonnet Creamery, Inc., against said debtor's employer, Gulf Milk Association, Inc., wherein it was adjudged the sum of $3,857.85 due said creditor by appellant was held not to have been discharged by appellant's bankruptcy because of fraud and misrepresentation practiced by appellant in the purchase of milk from Blue Bonnet Creamery, Inc. (sometimes hereinafter referred to simply as "Blue Bonnet").
The present garnishment proceeding was initially consolidated with the case in which the aforesaid judgment creditor originally obtained the default judgment on which the subsequent garnishment proceeding is predicated and by which enforcement of the judgment is sought by appellee. See Blue Bonnet Creamery, Inc. v. Simon, La.App., 136 So.2d 443 and Blue Bonnet Creamery, Inc. v. Gulf Milk Association, Inc., La.App., 136 So.2d 445. The Supreme Court granted writs in these consolidated cases and rendered judgment remanding this garnishment proceeding to the trial court for the taking of additional evidence. The judgment now on appeal is that rendered by the trial court pursuant to the Supreme Court's order of remand.
A detailed statement of this matter was set forth by the Supreme Court in Blue Bonnet Creamery, Inc. v. Simon, 243 La. 683, 146 So.2d 162, as follows:
"Pertinent facts of record are to the effect that between December 9, 1958 and February 18, 1959, plaintiff Blue Bonnet Creamery, Inc. (hereinafter referred to as Blue Bonnet), accepted sixteen checks from Simon in payment of purchases made. The checks, drawn on the Commercial Bank & Trust Co., Covington, Louisiana, were deposited by Blue Bonnet in the Guaranty Bank & Trust Company, Hammond, Louisiana. They were not honored; they were charged to Blue Bonnet's account by the Guaranty Bank and returned to Blue Bonnet with the notation, `Not Sufficient Funds'; upon redeposit, the checks were again returned to Blue Bonnet with the same notation.
"On June 18, 1959, Blue Bonnet wrote to Simon, stating that it was still holding the above checks and requesting that the checks be made good within ten days after receipt of its letter. Simon failed to pay, and on August 28, 1959, Blue Bonnet filed suit in the 22nd Judicial District Court, Parish of St. Tammany, praying for the total amount of the checks ($9,074.68), plus an additional sum of $1,081.88 it alleged was due by Simon for cartons and containers furnished from March 1, through April 30, 1959, as per the account attached to the petition. The petition contained the following allegation:
"`That your petitioner alleges that defendant knew at the time of issuance of said checks that he did not have sufficient credit with the Commercial Bank and Trust Company of Covington, Louisiana, for the payment of said checks in full upon their presentation.'
"On November 6, 1959, the district court, Parish of St. Tammany, rendered a judgment by default in favor of Blue Bonnet and against Simon in the full amount of $10,156.56. On confirmation of the default, James Eugene Reno, Manager and Secretary-Treasurer of Blue Bonnet, identified the sixteen checks herein involved and the letter demanding that they be paid; he stated that the checks were in payment of milk *135 received by Simon from the creamery; he also testified with respect to the cartons and containers furnished Simon. Reno concluded his testimony by stating that the checks were returned by Simon's bank unpaid, and that Simon had never paid for the cartons and containers. Mrs. Edna Heintz, a deputy clerk of court, testified that neither answer nor pleadings were filed by Simon in the matter.
"On November 7, 1960, Simon filed a petition for a devolutive appeal from said judgment of the 22nd Judicial District Court, Parish of St. Tammany. The Court of Appeal stated, however, that the appeal was taken to that portion of the judgment of the lower court where it was found, `that defendant had issued to petitioner $9,074.68 total of worthless checks during the period from December 9, 1958, through February 17, 1959, in the exchange for goods and merchandise delivered to defendant at the same time.'
"On April 4, 1960 (before the devolutive appeal, supra, was taken), Blue Bonnet filed a petition in the 21st Judicial District Court, Parish of Tangipahoe (sic), making Simon's employer, Gulf Milk Association, Inc. (hereinafter referred to as Gulf Milk), a garnishee. * * *"
Answers to interrogatories revealed that Simon was employed by the garnishee, Gulf Milk Association, Inc.
The Supreme Court opinion further shows:
"On June 20, 1960, the Judge of the 21st Judicial District Court, Parish of Tangipahoa, rendered a judgment on Blue Bonnet's petition for the garnishment of Gulf Milk as to Simon's salary. The Judge observed in said judgment that on April 13, 1960, the Bankruptcy Division of the United States District Court at New Orleans issued a Stay Order, subject to hearing on April 18, 1960; he ordered that the garnishment under fieri facias issued against Gulf Milk remain in effect pending further proceedings by Simon to obtain his discharge, and that the question of whether or not Simon's discharge in bankruptcy would effect this particular debt be taken up in due course by said 21st Judicial District Court, Parish of Tangipahoa. This judgment further ordered that Gulf Milk deduct from the wages of Simon an amount equal to twenty per cent. of his earnings, said deduction to continue until the matter of the dischargeability of the above judgment be finally determined, and that said funds be held by Gulf Milk subject to further orders of the Tangipahoa Parish District Court.
"On February 24, 1960, Simon was adjudged a bankrupt on a petition filed by him on February 24, 1960.
"On September 4, 1960, the Referee in Bankruptcy (presumably as a result of the hearing on April 18, 1960) rendered an order to the effect that Simon was discharged from all debts and claims which were made provable by the Act against his estate, except such debts as were, by said Act, excepted from the operation of a discharge in bankruptcy.
"After the order of September 4, 1960, Simon brought a rule to show cause why the garnishment under writ of fieri facias should not be set aside and annulled, and why Gulf Milk should not be ordered to tender him the monies withdrawn from his salary and held in escrow. Blue Bonnet prayed for recall of the rule, alleging that its judgment was based on a debt for money obtained by false pretenses or false representation (U.S.C.A. Title 11, Sec. 35), which was not a dischargeable debt.
"The trial court, in written reasons, stated that Blue Bonnet's original judgment was taken by default against Simon who apparently did not make any appearance or defense whatsoever; that *136 the judgment contained a finding that Simon had issued $9,074.68 total of worthless checks for goods and merchandise delivered to him at the same time. It ruled that it was of the opinion that the sum of $9,074.68, which was shown on the face of the judgment to be represented by worthless checks, was not discharged, but that the sum of $1,081.88 shown in said judgment was discharged by the discharge in bankruptcy. The court then rendered judgment on October 28, 1960, in favor of Blue Bonnet and against Simon and Gulf Milk, decreeing that Blue Bonnet's judgment obtained in St. Tammany Parish was not a dischargeable debt within the Federal Bankruptcy Act up to the amount of $9,074.68, plus interest; it further decreed that the writ of fieri facias was valid up to $9,074.68; it ordered that Gulf Milk deliver to Blue Bonnet twenty per cent. of Simon's salary from the date of service of the original writ through October 28, 1960, recalled and vacated the rule issued, and ordered the garnishment to proceed according to law."
The judgment hereinabove lastly mentioned was also appealed by the judgment debtor, Simon. The two appeals thus taken from different judicial districts were consolidated for hearing before this Court.
In the garnishment proceeding counsel for Simon introduced in evidence the discharge in bankruptcy issued appellant September 4, 1960, in Federal Court. Counsel for Blue Bonnet offered in evidence the record in the suit from the 22nd Judicial District Court, St. Tammany Parish (wherein the default judgment was rendered against appellant in favor of Blue Bonnet) including the checks attached to the petition filed therein.
On appeal, this Court reversed the judgment of the St. Tammany Parish Court insofar as it held, "that defendant had issued to petitioner $9,074.68 total of worthless checks during the period from December 9, 1958, through February 17, 1959, in exchange for goods and merchandise delivered to defendant at the same time," and affirmed the judgment as to the other decrees rendered therein. In the garnishment proceeding appealed from the Tangipahoa Parish Court, this Court reversed the judgment and ordered all funds held in escrow by the garnishee, Gulf Milk Association, Inc., be paid to appellant, Simon.
Upon issuance of writs by the Supreme Court, the creditor, Blue Bonnet, contended before said tribunal that fraud had been established in the St. Tammany Parish suit wherein judgment was obtained against appellant and therefore the debt was not discharged by Simon's subsequent discharge in bankruptcy. On the other hand, appellant, Simon, maintained this Court correctly found the fraud alleged had not been established by the judgment creditor and also contended evidence of fraud beyond that contained in the record of the creditor's main action against appellant could not be considered in the garnishment proceeding, therefore a remand for the taking of additional evidence was improper.
The Supreme Court held, however, that fraud and the dischargeability of Blue Bonnet's claims were not issues in the initial suit which resulted in default judgment being rendered in favor of the creditor, but rather arose when the creditor attempted to execute its judgment by the subsequent garnishment proceeding. Reasoning thusly, the Supreme Court concluded no inference of fraud could be drawn from the record in the original suit and further opined the evidence upon trial of the rule in the garnishment proceeding could not be limited to that evidence which appears of record in the initial action. In addition the Supreme Court found the record contained insufficient evidence which appears of record in the issue of fraud could be predicated. Having made such findings, the Supreme Court, in the interest of justice, remanded the garnishment proceedings to the trial court for the taking of additional evidence on the question of fraud. In particular, the Supreme Court suggested evidence be adduced with *137 respect to any false representations which may have been made by Simon and whether Blue Bonnet relied thereon or acquiesced therein. Simon's privilege of testifying as to any or all such issues was expressly recognized and preserved. Having reached such findings the Supreme Court reversed the decision of this Court (which set aside the judgment of the St. Tammany Parish District Court) inasmuch as the sole issue in said action was the indebtedness vel non of the defendant, Simon.
For reasons not apparent in the record, on remand to the lower Court, the matter was tried upon a new rule, and after taking additional testimony, the trial court rendered judgment decreeing that of the balance due Blue Bonnet by Simon the sum of $3,857.85 was not dischargeable under the bankruptcy act.
It is from this judgment the debtor, Simon, has appealed herein. Plaintiff, creditor, has answered the appeal praying that the full sum of $9,074.68 be declared non-dischargeable.
The issue presented is purely one of fact, namely, whether Simon did in fact obtain goods and merchandise from Blue Bonnet by means of false representations. Resolution of the issue can only be had in the light of the events and circumstances attending the transactions between the litigants.
In July, 1958, Blue Bonnet and Simon entered into a written contract wherein the former agreed to sell milk products to the latter for resale in Simon's business which was operating four retail milk routes to household consumers. The arrangement called for settlement by check every fourteen days. Matters progressed satisfactorily until approximately September 25, 1958, when, overnight Simon lost three of his retail routes as the result of having three of his drivers or routemen simultaneously hired by a large competitor, National Dairy Products. Immediately Simon's business began a sharp decline and his checks given in payment for milk purchased from Blue Bonnet began to "bounce". Simon's balance with Blue Bonnet began to mount steadily as a result of which meetings were held with James E. Reno, Manager of Blue Bonnet's local plant, about the status of appellant's account. Simon became so involved that at a meeting held January 7, 1959, it was decided he would issue a check daily for milk purchased and would add $100.00 to each check ($200.00 on Saturday) which excess or surplus would be applied to the balance then due. Although Simon indicated his checks would probably not be good inasmuch as he had suffered the loss of approximately three-fourths of his customers, Reno nevertheless insisted the checks be given daily. As these daily checks were deposited for collection many were dishonored, some two or three times. Matters continued in this state with the result Simon's balance grew progressively larger. On January 17, 1959, Simon was placed on a cash basis with the understanding he would thereafter be sold milk only when he presented cash in payment therefor and in addition he was to pay Blue Bonnet the sum of $300.00 cash, monthly, to apply on his outstanding account. An undetermined amount of milk was thus purchased between January 17, 1959 and May 9, 1959, on which latter date Simon closed his business. On January 17, 1959, Simon paid Blue Bonnet $300.00 cash on his outstanding balance and on April 18, 1959, he paid $322.23 cash, of which sum $300.00 was credited to his old account.
Considering first Blue Bonnet's answer to this appeal, we conclude the trial court was eminently correct in finding that the amount sued for in excess of the $3,857.85 allowed, represented checks given during the period prior to the January 7, 1959 meeting and in pursuance of the then existing written open-account agreement. As to these checks there could be no fraud inasmuch as it is settled law that a worthless check given in payment of an open account or pre-existing indebtedness cannot be issued with intent to defraud. State v. McLean, 216 La. 670, 44 So.2d 698. Obviously *138 a check given under such circumstances deprives the creditor of nothing. Neither does the debtor receive anything of value for his check. The creditor is not misled by such action on the part of the debtor to extend credit or deliver goods or merchandise under false representations on the part of the debtor. It is merely the giving of a worthless check in payment of an antecedent obligation. It follows that the judgment of the trial court must be affirmed insofar as it rejects that portion of plaintiff's claim represented by checks antedating January 7, 1959.
With respect to the portion of the debt found non-dischargeable, our esteemed brother below stated:
"It appears to the Court that Mr. Simon was hopelessly insolvent when he induced Blue Bonnet to continue milk deliveries in 1959, even on a cash basis. The testimony further shows that Mr. Simon and his attorney held out as inducements to Blue Bonnet, and in (1) the promise of a Small Business Administration loan, for which, obviously, Mr. Simon could not obtain in his insolvent condition, and (2) the filing of a $250,000.00 triple damage suit against Sealtest, which suit never produced any results or recoupment for Mr. Simon. The Court considers these circumstances as very important on the matter of Mr. Simon's intention in securing milk from Blue Bonnet, and the circumstances under which Blue Bonnet permitted Mr. Simon to receive it during January and February of 1959.
"Mr. Reno, Blue Bonnet's Manager, testified that even after the check had been returned by the bank `NSF', that he would call Simon's Creamery and be assured by Mr. and Mrs. Simon that the check would be made good if redeposited. As Mr. Simon was receiving milk daily during the period January 27th, through February 18th, 1959, it is apparent that during this twenty-three (23) day period, that there were 10 days on which Mr. Simon's checks were actually good. Mr. Reno stated that he delivered this milk to Mr. Simon, relying on Mr. Simon's assurances that these checks were good. The Supreme Court in remanding this case allowed Mr. Simon full opportunity to prove, if he could, that Blue Bonnet Creamery had any notice that the checks would not be honored, and he failed to prove any such notice. On the contrary the evidence produced at the trial affirmatively shows that Blue Bonnet's deliveries were based upon the assurances by defendant and his wife that the checks were good.
"Accordingly, the Court holds that Mr. Simon made false representations to Blue Bonnet Creamery to obtain delivery of milk products; that Blue Bonnet did rely on these representations, to their detriment, and further, the evidence fails to show any acquiescence by Blue Bonnet. The redeposit of certain of the checks was at Mr. Simon's request and cannot be construed as notice that any subsequent check may not clear, particularly in view of the number of checks that did clear during the same period."
In alternatively urging our affirmation of the trial court's judgment decreeing appellant's obligation non-dischargeable in the sum of $3,857.85, able counsel for Blue Bonnet relies upon the instances of misrepresentation cited by the district court in the reasons for judgment quoted above and upon the provisions of LSA-R.S. 14:71, Criminal Code, which defines the crime of issuing worthless checks, as follows:
"§ 71. Issuing worthless checks
"Issuing worthless checks is the issuing in exchange for anything of value, with intent to defraud, of any check, draft, or order for the payment of money upon any bank or other depository, knowing at the time of the issuing that the offender has not sufficient credit with the bank or other depository for *139 the payment of such check, draft, or order in full upon its presentation.
"The offender's failure to pay such a check, draft, or order, within ten days after the receipt by him of written notice of its non-payment upon presentation, shall be presumptive evidence of his intent to defraud. * * *"
Plaintiff contends the letter of demand sent appellant prior to filing the original suit on which judgment was obtained, satisfied the requirement of the second paragraph of LSA-R.S. 14:71. On this premise it is argued the debtor is presumed to have intended to defraud.
We seriously question applicability of the cited article of the Criminal Code to the case at bar which is strictly a civil proceeding. We observe that the reporter's notes to the quoted article indicate that the definition of "issuing" as contained therein is to be taken from LSA-R.S. 7:191, the pertinent portion of which reads as follows:
"`Issue' means the first delivery of the instrument, complete in form, to a person who takes it as a holder."
Defendant, Simon, testified he delivered the checks complete except as to the amount which was later inserted by Blue Bonnet's employees dependent upon the value of milk products delivered in each instance. In this regard Simon is corroborated by the checks themselves which show the date, payee, and signature in one handwriting and the amount in a different ink and inscription. In addition, Mrs. Hilda Anderson, general office manager for Blue Bonnet, when called on cross-examination, readily admitted she filled out the checks by inserting the amounts therein. Although LSA-R.S. 7:14 provides for the filling of the amount of a negotiable instrument by an authorized payee, there nevertheless remains a serious question whether, in the contemplation of LSA-R.S. 14:71 there was an issuing of the checks coincident with a presumed intent to defraud.
In any event, we pretermit the matter of the presumption relied upon by Blue Bonnet for, assuming its applicability, it is nevertheless rebuttable and the issue posed thereby must be resolved in the light of the facts and circumstances surrounding the giving of such checks when extenuating or exculpating evidence is offered by the party charged with fraud.
Section 17 of the Federal Bankruptcy Act (Title U.S.C.A. Section 35, sub. a, (2) provides that a discharge in bankruptcy shall release a bankrupt from all provable debts excepting liabilities for obtaining money or property by false pretenses or false representations.
It is settled jurisprudence that for the cited provision of the Federal Bankruptcy Act to be applicable the creditor relying thereon bears the burden of establishing: (1) that the debtor made false representations; (2) the making of such false representations with intent to defraud the creditor; and (3) the creditor's reliance upon such false pretenses or representations. De Latour v. Lala, 15 La.App. 276, 131 So. 211; Accounts Supervision Company v. Atley, La.App., 89 So.2d 508. See also Seybold Finance Service, Inc. v. Schwaner, La.App., 102 So.2d 317; Personal Finance Company of Lake Charles v. Huber, La. App., 77 So.2d 740; Excel Finance Mid City, Inc. v. Chetta, La.App., 160 So.2d 304; CHF Finance Company v. Smith, La.App., 158 So.2d 272; CHF Finance Company v. Corca, La.App., 152 So.2d 830; Earl Staehle Finance, Inc. v. Brooks, La.App., 144 So.2d 155.
In the instant case the record is clear that until Simon began to suffer financial reverses as the result of the aforementioned loss of the major portion of his customers, his account with Blue Bonnet was kept current. Subsequently, however, the decline of his business accelerated and the status of his account with Blue Bonnet deteriorated accordingly. In an attempt to arrive at a solution to the dilemma a series of meetings were held between Simon and Reno which *140 were attended at various times by one or more of the following individuals: Mr. Wright (owner of 50% of the stock in Blue Bonnet corporation); Mr. Ellis Magee (Simon's attorney); Mrs. Simon; and Mr. Merle Bazer (former owner of the creamery operated by Simon). The object of these meetings (particularly the first ones) was Simon's desire to obtain Reno's advice and help in combatting the competition which had for all practical purposes shorn Simon of his customers. The conference between Reno and Simon held January 7, 1959, was also attended by Mrs. Simon and Bazer.
Reno's testimony regarding his acceptance of Simon's checks, taken under interrogatories and cross-interrogatories, is found in the following questions and answers thereto appearing of record:
"Interrogatory 4: With regard to the checks described in the attached list, state what representations, if any, were given by Mr. and Mrs. Denis E. Simon, Jr., upon which you relied in delivering merchandise in return for said checks.
"Answer 4: Without refreshing my memory with the records of the Blue Bonnet Creamery, I would not be in a position to state that these dates are exactly correct. I assume that Mr. Simon was paying for his milk possibly in the first part of December, but as to the later part, I would not be in a position to state concisely the exact date that the change-over was made where he was to go into a cash day by day basis.
"16th Cross-interrogatory: Why did you permit Simon to continue giving Blue Bonnet worthless checks after receiving the first one?
"Answer 16: After receiving the first check of Mr. Simon's that was returned to me for insufficient funds, I was assured by both Mr. and Mrs. Simon that this check would be honored after certain collections were made by them from their accounts.
"21st Cross-Interrogatory: Whose idea was it to demand daily checks of Simon, and why? Wasn't the reason a concerted effort to prevent a discharge of the Blue Bonnet indebtedness in Simon's bankruptcy?
"Answer 21. It was, I believe, Mr. Wright's and my idea to accept these daily checks for daily delivery from Mr. Simon and he also assured us that he would pay a portion of which was specified in his written contract on his past due account. The answer to the second part of 21 is no.
"27th Cross-Interrogatory: After a number of checks had `bounced,' and while you were holding checks that had been returned by the bank marked N. S. F., were you surprised when a later check also `bounced?'
"Answer 27. `Yes.'
"28th Cross-Interrogatory: Specifically, when you held at the Blue Bonnet office checks numbered 498, 519, 526, 579, 586, 564, and 580, did you honestly expect all the checks numbered 4, 2, 599, 600, and 3 to be good? If your answer is in the affirmative, please explain in detail.
"Answer 28. I expected at all times his checks to be good because he kept promising and assuring me that they would be good."
The foregoing constitutes all the testimony offered on this point by Blue Bonnet. The remainder of Reno's testimony indicates little independent recollection of most matters. Having left this state and moved to Arizona some time ago, it is understandable he was unable to testify in detail without access to his company's records.
Simon, Mrs. Simon and Bazer, the latter a disinterested witness, testified unequivocally that at the meeting on January 9, 1959, Reno insisted Simon give a daily check for *141 purchases, with $100.00 added each weekday and $200.00 added each Saturday to be applied on Simon's past due account, notwithstanding Simon's protestation he did not have "that kind of money" and that "sometimes the check wouldn't be any good." They further stated that to Simon's aforesaid remonstrances Reno replied "* * * well, I would like for you to send the checks anyway."
On behalf of plaintiff-creditor it is contended that inasmuch as during the crucial period Simon made good on approximately $30,000.00 of $39,000.00 in checks accepted by Reno, the fact that Reno's experience showed 75% of the checks would eventually clear justified his continued acceptance of payment in said manner. It may be that Reno was justified in accepting Simon's checks under such circumstances considering a dishonored check has at least one business advantage over an open account, namely, it may be re-presented at the drawee bank from time to time in the hope of its being honored as the result of subsequent deposits. However, the question before the court is not Reno's motives in accepting the checks but whether, under the circumstances shown, Simon can be said to have been guilty of intent to defraud.
It must be conceded an obligation arising from property obtained by the issuance of worthless checks is dischargeable in bankruptcy unless the debtor was guilty of misrepresentation with intent to defraud in connection with the issuance of such checks. This is inevitably so because alleged non-dischargeability of such an obligation is predicated on 11 U.S.C.A. § 35 which requires proof of fraud to bar discharge.
Pertinent to the case at bar is the following pronouncements found in Excel Finance Mid City, Inc. v. Meilleur, La.App., 137 So.2d 503:
"When a small loan company has been doing business satisfactorily with a borrower for many years, and has the means to check. his financial responsibility, especially within its own organization, but closes its eyes, it should be estopped to complain of misrepresentation. If it were otherwise, a creditor could easily make its credit or loan immune from discharge in bankruptcy by the simple expedient of closing its eyes to what is obviously not true, and easily detected."
Granted we are not here concerned with a small loan company, however, it cannot be gainsaid the principle is analogous. A creditor cannot close his eyes to his previous dealings with the debtor and claim to have been misled. C. H. F. Finance Company v. Smith, La.App., 158 So.2d 272. To paraphrase the above quotation from the Meilleur case, supra, if it were otherwise, a creditor could easily render his claim immune from discharge in bankruptcy by the simple expedient of demanding checks from the debtor even though the creditor is forewarned by the debtor, that the checks will in all probability not be honored immediately upon presentation.
The record in the instant case overwhelmingly preponderates in favor of the conclusion Reno was fully apprised of Simon's precarious financial condition. During the course of the numerous meetings held with Reno, Simon offered to produce all his books and records and did on occasion present at least some for Reno's inspection. It is inconceivable that under such circumstances Reno was not completely aware of Simon's inability to amortize the balance on his delinquent open account at the rate of approximately $700.00 weekly. Reno knew Simon had lost the bulk of his business and if he were to survive at all, Simon must engage in a protracted rebuilding program. Furthermore, Reno was cognizant of the fact Simon's checks were likely to be dishonored upon presentation inasmuch as past experience had shown many were deposited two and three times before being honored. It appears that, for reasons best known to himself, Reno insisted upon receiving daily checks notwithstanding his intimate *142 knowledge of Simon's business affairs and Simon's frank disclosure that in all probability some of the checks would not be honored upon presentation.
Our careful analysis of the record leads to the conclusion our able brother below erred in concluding the creditor's deliveries of merchandise were based upon the debtor's assurances that his checks were good. The thrust of Reno's testimony in this regard is that when checks were returned by the bank, he would call Mr. or Mrs. Simon and would be assured by them that the checks would be honored after certain collections were made from their customers. We fail to see wherein this constitutes unequivocal evidence of intent to defraud. Such statements by the debtor were not assurances the checks were good when issued; they constituted mere assurances that the checks would be made good when subsequent accounts were collected by the debtor from persons indebted to him. In essence they were representations or promises the checks would be made good when funds became available. The mere fact that a debtor promises to pay and subsequently fails to meet this obligation will not bar his discharge of the debt created as a result of the unfulfilled promise. De Latour v. Lala, 15 La.App. 276, 131 So. 211.
We find that the debtor in the case at bar made a full and complete disclosure of his financial circumstances to the creditor notwithstanding which plaintiff insisted upon taking checks which, under the circumstances, it could reasonably anticipate would not necessarily be honored on presentation. Not only has the creditor failed to establish fraud as required but also, assuming any presumption thereof obtained herein, the debtor has refuted such presumption by a clear preponderance of evidence.
The sole remaining issue is whether there was any intent on the part of Simon to defraud in making representations concerning the pendency of his loan application and his suit against his competitor.
The record does not make entirely clear just what representations were made by Simon and his attorney regarding the loan application and suit excepting that Simon had in fact made such an application and filed an antitrust action for treble damages against a concern known as National Dairy Products. Both said representations were true inasmuch as the loan application and suit were pending when Simon so asserted to Reno. It further appears the loan application was never rejected by the agency to which it was made and neither was it withdrawn until Simon decided to cease operations. The antitrust suit was in fact filed but the record does not indicate the disposition thereof, if any. Neither of said declarations can be considered the basis of fraud or misrepresentation. Under the circumstances indicated, the most plaintiff can impute to its debtor is the latter's exaggeration of the hope of obtaining a loan or recovering judgment in a pending lawsuit. Such, we believe does not constitute fraud or misrepresentation but rather the mere declaration of one's wishful expectations.
Accordingly, it is ordered, adjudged and decreed the judgment of the Honorable Twenty-first Judicial District Court, Tangipahoa Parish, is reversed insofar as it declares the judgment against the debtor, Simon, non-dischargeable for fraud in the sum of $3,857.85.
It is further ordered, adjudged and decreed that the rule to show cause issued by the Honorable Trial Court on February 18, 1963, be and the same is hereby made absolute.
It is further ordered, adjudged and decreed that the judgment rendered in favor of plaintiff, Blue Bonnet Creamery, Inc., against defendant, Denis E. Simon, Jr., in Suit Number 16,404 on the docket of the Honorable Twenty-second Judicial District Court, St. Tammany Parish, be and the *143 same is hereby pronounced and declared discharged in full by operation of the Federal Bankruptcy Act.
It is further ordered, adjudged and decreed that the writ of fieri facias issued at the instance of Blue Bonnet Creamery, Inc. against defendant, Denis E. Simon, Jr., be and the same is hereby annulled, recalled and set aside; that the garnishment proceedings instituted by Blue Bonnet Creamery, Inc. against the garnishee, Gulf Milk Association, Inc., be annulled and set aside; and that the monies held in escrow by said garnishee pursuant to said garnishment be paid to the debtor, Denis E. Simon, Jr. All costs to be paid by plaintiff, Blue Bonnet Creamery, Inc.
Affirmed in part, reversed in part and rendered.
NOTES
[*] Due to the subsequent death of HERGET, J., this opinion is rendered by ELLIS, LOTTINGER, LANDRY and REID, JJ.