In re Louis JENES and Catherine Jenes, a/k/a Catherine Macheras as Catherine Patricia Brown, Debtors.

C.O.T.C.O. GASOLINE, INC., Plaintiff,

v.

Louis JENES and Catherine Jenes, a/k/a Catherine Macheras as Catherine Patricia Brown, Defendants.

Bankruptcy No. 81–00760–BKC–JAG.

Adv. No. 81–0398–BKC–JAG–A.

United States Bankruptcy Court, S. D. Florida.

Dec. 2, 1981.

Marvin S. Schulman, Law Offices of Roy W. Allman, Fort Lauderdale, Fla., for plaintiff.

Bernard J. Levy, Hollywood, Fla., for debtors/defendants.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

Plaintiff C.O.T.C.O. Gasoline, Inc. filed its adversary action to determine the dischargeability of a debt owed to it by the debtors, who were doing business as L. Palmetto Citgo Service Center. The president of C.O.T.C.O., Richard Eugene Coan, and both of the debtors testified at trial.

Sometime prior to the events in question, Louis Jenes began operating a service station in partnership with a person who is not a party to this action. Eventually the partner left, but he had made several unauthorized withdrawals from the partnership checking account, and therefore Jenes did not want to continue using that checking account. He did not close it, but used it infrequently and only deposited money to cover checks which he wrote on that account. He testified that his bank would not open a second business checking account. Therefore, he opened a personal account with his wife, Catherine Jenes, but used that account for service station business. (See Plaintiff's Exhibit No. 2). The check book for the personal account was left at his home and he kept only a few checks at the station. No one kept a·continuous running balance in the check book but Louis Jenes testified that he knew that each check written would be covered, and Catherine Jenes testified that when he instructed her to write checks she would verify with him that the balance in the account was sufficient to cover the checks. Nevertheless, some of their checks had been returned for insufficient funds, although at least once the returned item was because of a bank error.

The service station had receipts of approximately $1,000 per day, approximately eighty percent of which was for the sale of gasoline.

In January, 1981, the defendants first consulted their attorney about filing in

bankruptcy. Mrs. Jenes had been ill over a period of three years and they had substantial medical bills. They began paying their attorney in installments but did not make the final decision to file at that time.

C.O.T.C.O. was an independent supplier of gasoline. It had made deliveries to the station twice previous to the sale in question. On Saturday, April 11, 1981, C.O.T.C.O. had a delivery of 8,500 gallons of gasoline made to the station. C.O.T.C.O. does not have its own trucks and a common carrier made the physical delivery. There was a dispute in the testimony as to whether Mr. Coan always required payment prior to unloading the gasoline; however, he neither accompanied nor met the driver of the gasoline truck on this occasion and therefore did not obtain payment from the Jeneses on that date. The gasoline delivered from C.O.T.C.O. would have lasted the station approximately a week.

On the following Monday, April 13, 1981, Mr. Coan went to the station at approximately 8:00 a. m. to collect payment. Louis Jenes had run out of checks at the station and told Coan to go to the Jenes' home and obtain payment from Catherine Jenes. Mr. Coan insists, had he not received payment on that day, he would have pumped the gasoline back out of the station's tank, although it would have been at some expense to himself to do so. However, that was not necessary because he did obtain a check from Mrs. Jenes for $10,738.75.

Coan testified that later he received a phone call from an unknown person regarding the check. The substance of the conversation was not admitted, as being hearsay, but Coan claims that as a result he did not deposit the check until Thursday. Both Mr. and Mrs. Jenes deny making any such phone call or knowing of any such phone call. The check was returned to Coan for insufficient funds, and he was told to redeposit it, which he did. The Jeneses did not receive any telephone advice from their bank that the check was being returned, and did not know about it until Mr. Coan informed them.

Mr. and Mrs. Jenes had been having marital difficulties and on April 21, Catherine Jenes withdrew $6,000 from the personal checking account and left town. She testified that she asked the bank what the current balance was, and left approximately $1,000 to cover checks which she knew were outstanding. She assumed that by that date the C.O.T.C.O. check had cleared and that the balance represented funds remaining after that check had been paid. The bank did not inform her that the C.O.T.C.O. check had been returned for insufficient funds on the previous day.

Louis Jenes learned what his wife had done when he arrived home that night and found a note from her. He immediately went looking for his wife and the money, knowing that there would then be insufficient funds for the redeposited C.O.T.C.O. check. He located Catherine in North Carolina about a week later and returned to Florida a short while after that. His wife eventually returned with $5,000 but the C.O.T.C.O. debt was never paid.

Louis Jenes did not receive actual notice from the bank of the returned item until after he came back from North Carolina. He testified that he did not know of the insufficiency of funds in the bank account at the time the check was written.

Catherine Jenes had signed a petition in bankruptcy prior to her leaving Florida, although her husband was not aware of it at the time. After his return he also signed the petition and it was filed.

Plaintiff asserts that its debt should be excepted from discharge under 11 U.S.C. § 523(a)(2)(A) which provides that an individual debtor shall not be discharged from any debt "for obtaining ... property ... by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." To be excepted from discharge under this section, the debt must have been incurred through actual fraud or misrepresentations, not fraud implied in law. The action by the debtor must have been intentional, and merely reckless representations are insufficient to bring a debt within this section. If property is obtained prior to the making of any false representation, subsequent representations will not

prevent discharge of the debt. See *Collier on Bankruptcy*, 15th ed., § 523.08[4].

Plaintiff argues that the debtors obtained credit from C.O.T.C.O. in that the gasoline was delivered on Saturday and payment was not made until Monday, and that they misrepresented their financial situation to the creditor in obtaining such credit. The facts do not support this argument in any way. All the evidence suggests that the only reason plaintiff did not obtain a check on Saturday was because Mr. Coan was not present. The driver who delivered the gasoline was not an employee of C.O.T.C.O. and payment could not be made to him. It was less than half a business day later that C.O.T.C.O. received the check.

Another assertion of plaintiff is that debtors obtained the gasoline as part of a fraudulent scheme, knowing that they were going into bankruptcy. The debtors had first obtained information about filing for bankruptcy approximately three months prior to these events and they did not actually file until over one month later. The service station was operating continuously during this period and required deliveries of gasoline at least weekly. This delivery by C.O.T.C.O. was in the regular course of the service station business and in no way can be construed to have been a last minute attempt to obtain assets and secrete them without paying, on the eve of bankruptcy. The court concludes that there was no fraudulent intent in the gasoline having been ordered from C.O.T.C.O. at this time.

The final question is whether the act of giving a check which is returned for insufficient funds, satisfies the requirement of fraud or false representations. The cases hold that simply issuing a worthless check to purchase goods does not in and of itself constitute fraud. There must be proven the intention to commit fraud or to mislead the other party beyond the mere giving of a check which is not paid. "It must be conceded an obligation arising from property obtained by the issuance of worthless checks is *dischargeable* in bankruptcy unless the debtor was guilty of misrepresentation with intent to defraud in connection with the issuance of such checks." (emphasis added). *Blue Bonnet Creamery, Inc. v. Gulf Milk Assoc.*, 172 So.2d 133, 141 (CA La.1965). Also *Swanson Petroleum Corp. v. Cumberland*, 184 Neb. 323, 167 N.W.2d 391 (1969); *Trumbull Building Center, Inc. v. Buttendorf*, 11 B.R. 558, 562 (U.S.Bkrtcy.Vt.1981); *In Re Kurrant*, 3 B.C.D. 832, 14 C.B.C. 783 (U.S. Bkrtcy.M.D.Fla.1977).

Plaintiff makes much of the fact that Catherine Jenes withdrew $6,000, as evidence of the fraudulent intent to deprive plaintiff of its payment. Plaintiff overlooks the fact that the check had been returned for insufficient funds prior to this withdrawal which was more than a week after the check was drawn and even longer after the gasoline delivery was made. The court finds that there was no actual fraudulent intent in Mrs. Jenes' withdrawal of the $6,000 or in the debtors' giving the check originally. Therefore, the debt to plaintiff is dischargeable.

In accordance with B.R. 921(a), a separate Final Judgment incorporating these Findings and Conclusions is being entered this date.