## In re Daniel H. OVERMYER a/k/a D.H. Overmyer, Dan Overmyer, and Daniel Harrison Overmyer, Debtor.

### Bankruptcy No. 82 B 20329.
### 82 Adv. 6160.

United States Bankruptcy Court,
S.D. New York.

May 23, 1983.

McConwell & Sullivan, Overland Park, Kan., for plaintiff.

Reich & Reich, White Plains, N.Y., for debtor.

---

## DECISION ON COMPLAINT OF EDWARD A. McCONNELL RE NONDISCHARGEABILITY OF DEBT.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Edward A. McConnell, the plaintiff in this case, is an attorney who claims that the debtor, Daniel H. Overmyer, is personally liable to him for unpaid legal fees for services performed for R.T. Systems, Inc., a public corporation of which the debtor is chairman of the board and chief executive officer. Plaintiff also claims legal fees for services performed for the debtor personally. The plaintiff further contends that the debtor's liability for the unpaid legal services is nondischargeable under Code § 523 by reason of the debtor's fraud and false representations upon which the plaintiff relied.

### FINDINGS OF FACT

1. On May 28, 1982 the debtor, Daniel H. Overmyer, filed with this court his voluntary petition for relief under Chapter 7 of the Bankruptcy Reform Act of 1978.

2. At all times during the period in question the debtor was the chairman of the board, chief executive officer and con-

128

trolling voice of R.T. Systems, Inc., a public corporation organized under the laws of the State of Delaware with principal offices at 3 Park Avenue, New York, New York.

3. Plaintiff is an attorney at law with offices located in Johnson County, Kansas.

4. In 1977, the president of R.T. Systems, Inc. was Peter Starr, who was a client and a personal friend of the plaintiff. Peter Starr caused R.T. Systems, Inc. to retain the plaintiff to commence an action against Midwest Communications in the United States District Court for the District of Kansas. That case was subsequently transferred to the United States District Court for the Northern District of Texas. In early 1979, the case was consolidated with several related cases for a single trial scheduled for April 22, 1979. Up until that time the plaintiff had received from R.T. Systems, Inc. between $75,000 to $90,000 in legal fees and was owed, according to his calculations, approximately $151,000 for unpaid legal services and expenses.

5. In the course of his representation of R.T. Systems, Inc. the plaintiff had occasion to meet with the debtor, Daniel H. Overmyer, concerning the progress of the litigation. As a result of one such meeting, the plaintiff performed certain legal services for the debtor personally in Dallas, Texas, in 1978, regarding an entity referred to as Elliot Realty Company. Several other persons in the plaintiff's firm also performed legal services in this matter, for which the plaintiff billed the debtor $13,922.00.

6. During the evening of the second night after the commencement of the Dallas trial, the plaintiff had a telephone conversation with the debtor who informed the plaintiff that he had heard that the trial was not going well and that he wanted the debtor's associate, Thomas Bornhold, to take over as trial counsel for R.T. Systems, Inc. The plaintiff objected to this strategy, to which the debtor responded that he would shoulder the responsibility for this change. The plaintiff reluctantly acquiesced, although he disagreed and wanted to continue, especially since R.T. Systems, Inc. owed him a substantial balance for legal fees and he believed that therefore he had a vested interest in the success of the trial. The debtor assured the plaintiff that his legal fees would be paid. The plaintiff's associate, Thomas Bornhold, then took over the trial of the action, as directed by the debtor.

7. On May 2, 1979 the jury in the Dallas case rendered a verdict against R.T. Systems, Inc. However, a portion of the case remained to be tried by the court without a jury. The plaintiff testified that the debtor continued to insist that the plaintiff should not try the nonjury case nor should he reinsert himself into the active conduct of the trial saying: "It's on my head." The plaintiff also testified that the debtor promised to send the plaintiff five $5,000 checks, totalling $25,000, as partial payment towards the plaintiff's unpaid bill for legal services. The plaintiff relied upon this promise and continued to perform billable legal services for R.T. Systems, Inc.

8. On May 3, 1979, the plaintiff telephoned the debtor from the hall telephone in the Dallas Courthouse and again discussed the matter concerning his fees. The debtor again said "Do it my way; it's on my head; whatever happens in this case, I will see that you're paid and I'll send you that money, the $25,000 immediately."

9. Thereafter, Thomas Bornhold, the plaintiff's associate, went to New York City, at the plaintiff's request, to discuss the pending case with representatives of R.T. Systems, Inc. John Donohue, the then president of R.T. Systems, Inc., handed Bornhold an envelope with the plaintiff's name on it for delivery to the plaintiff in Kansas City. When Bornhold returned to Kansas City on May 24, 1979, he gave the envelope to the plaintiff, which contained four checks dated May 18, 1979, each made payable to the plaintiff for $5000 and signed by John Donohue, as president of R.T. Systems, Inc. and David Raible, who was then the secretary of R.T. Systems, Inc. The plaintiff testified that Donohue included a note in the envelope advising the plaintiff not to deposit the checks without first calling Donohue.

10. The plaintiff testified that on May 21, 1979 he telephoned John Donohue and said: "I've got to go ahead and put these in and I have." The plaintiff also advised Donohue that the debtor had promised during the trial in April, 1979 that these checks would be sent and that, nevertheless, the plaintiff had not received any checks until May 21, 1979. The plaintiff had already deposited two of the four $5000 checks that he had received.

11. On May 28, 1979, the plaintiff received a letter from R.T. Systems, Inc., dated May 25, 1979 and signed by John Donohue as president, terminating the plaintiff's services for the corporation.

12. On June 1, 1979, the plaintiff travelled to New York to meet with the debtor concerning his unpaid fees, which were billed at a total of $219,141.75. The debtor, Daniel H. Overmyer, met with the plaintiff and reassured the plaintiff that the first two $5000 checks signed by Donohue and Raible on behalf of R.T. Systems, Inc., and which the plaintiff had already deposited, were good and should clear the bank. However, as to the balance, according to the testimony of Peter Starr, the debtor said that R.T. Systems, Inc. could not pay the bill because the corporation just did not have the money. A proposed solution was arrived at between the plaintiff and Peter Starr whereby the plaintiff's bill was to be reduced to $135,000 and to be paid by R.T. Systems, Inc. over a period of time. In addition to the four $5000 checks from R.T. Systems, Inc. that the plaintiff received on May 21, 1979, he was to receive a series of thirty-four weekly post-dated checks, totalling $115,000, for a total sum of $135,000. Twenty-two checks in this series were to be mailed to the plaintiff upon his return to Kansas. The plaintiff received these 22 checks, all dated June 19, 1979, in an envelope on June 21, 1979.

13. The first three checks in the post-dated series that were given to the plaintiff in New York were mistakenly made payable for $3000 each, instead of $5000. The debtor corrected the error by having checks drawn for the correct amounts. These three checks drawn by R.T. Systems, Inc. were signed by John Donohue as president of the corporation and the debtor as its chief executive officer. The bank account on which the checks were drawn was specially opened at Peter Starr's suggestion just to handle the prearranged installment payments to the plaintiff because the corporation had a cash flow problem and a corporate account had been subjected to a judicial lien. It was the plaintiff's understanding that R.T. Systems, Inc. would deposit sufficient funds in this account to cover the checks as they came due. The debtor had the responsibility for seeing to it that this account was funded because, as John Donohue testified, the debtor was exclusively in charge of supervising the payments of legal fees to attorneys.

14. The plaintiff testified that the series of checks that he received as a result of the June 1st meeting were delivered to him by R.T. Systems, Inc. unconditionally. The debtor, on the other hand, testified that when he signed the three checks on June 1, 1979, he informed the plaintiff not to deposit them until the plaintiff first contacted somebody at the company. The debtor testified that he believed that the $135,000 proposal was too high and he wanted Peter Starr to continue negotiating with the plaintiff because Peter Starr was the one who was responsible for the company's retention of the plaintiff as its attorney. Therefore, he cosigned the first three checks, together with John Donohue, each in the sum of $5000, and expected that Peter Starr would negotiate a settlement in the area of $80,000.

15. Shortly after June 1, 1979, when the plaintiff had returned to his office in Kansas, he learned that the first $5000 check from R.T. Systems, Inc. that had been signed on May 18, 1979 by John Donohue and David Raible, had been returned for insufficient funds. The plaintiff immediately called Peter Starr, who advised the plaintiff to send him the check for replacement by a bank check. The plaintiff mailed the requested check to Peter Starr but never received the promised replacement.

16. The creditor contends that no conditions were placed on his right to deposit the series of checks that he received from R.T. Systems, Inc. following the June 1, 1979 meeting in the corporation's office in New York City. Accordingly, he deposited the post-dated checks for collection as they came due without first consulting with anyone at R.T. Systems, Inc. with respect to whether or not there were sufficient funds in the account to cover the checks. None of the checks cleared the bank. The debtor contends that he repeatedly advised the plaintiff not to deposit any checks without first consulting with representatives of R.T. Systems, Inc. because the company had a serious cash flow problem.

17. The plaintiff testified that on July 24, 1979, the debtor specifically instructed him not to deposit any more checks.

18. By letter dated August 10, 1979, signed by David Raible, who was then secretary of R.T. Systems, Inc., the plaintiff was notified that R.T. Systems, Inc. had advised the bank where the special account was maintained not to honor any future checks drawn on this account.

19. At no time until the commencement of this case was there any letter or other written document from R.T. Systems, Inc. denying its liability to the plaintiff for the legal services he performed for the corporation nor was there any documentary evidence of any objection as to the amount claimed, other than the debtor's testimony that he wanted Peter Starr to attempt to negotiate a reduced amount in the area of $80,000.

20. The plaintiff performed legal services for R.T. Systems, Inc. at its request and incurred expenses in connection with such services for a total billed amount of $219,-141.75, no part of which was ever disputed or objected to other than the attempted renegotiation down to $135,000 on June 1, 1979, which amount was never paid. R.T. Systems, Inc., and not the debtor, is liable to the plaintiff for these services and expenses.

21. All of the checks in question relate to the legal services performed by the plaintiff for R.T. Systems, Inc. There was no evidence that any check related to any of the legal services performed by the plaintiff for the debtor personally in connection with the Elliot Realty Company. Apart from the Elliot Realty Company matter, there is no proof that any entity other than R.T. Systems, Inc. was indebted to the plaintiff for his legal services performed on behalf of R.T. Systems, Inc. Although the debtor co-signed three checks drawn by R.T. Systems, Inc. to all of its attorneys, the liability for such services was the corporate responsibility of R.T. Systems, Inc., a public corporation of which the debtor was not the alter ego.

22. The debtor's promise on May 27, 1979 on behalf of R.T. Systems, Inc. that the plaintiff would be paid $25,000 was just that; a broken promise. There was no proof that either the debtor or R.T. Systems, Inc. did not intend to pay the plaintiff for his legal services when the promise was made.

22. The four $5000 checks drawn by R.T. Systems, Inc. that were given to the plaintiff on May 18, 1979 were not signed by the debtor. The debtor did cosign three of the checks that were given to the plaintiff on June 1, 1979, after his services had been terminated; the remaining checks in the series of checks issued by R.T. Systems, Inc. were not cosigned by the debtor. Aside from the fact that these post-dated checks were not paid, there was no evidence of any fraud attributable to the debtor with respect to these checks.

24. There was no evidence to rebut the plaintiff's proof that he performed legal services for the debtor, personally, in connection with the Elliot Realty matter and that he billed the debtor $13,922.00 for these services. Moreover, there is no evidence that the debtor ever objected to the billed amount or to the value of these services. However, there was no proof that the debtor obtained these services by means of any fraud or false representations. Nor was there any proof that any of the checks in evidence that were drawn by R.T. Systems, Inc. related in any way to the debtor's personal liability for these legal services.

## DISCUSSION

Other than the Elliot Realty Company matter, which is a personal obligation of the debtor, the main portion of the plaintiff's claim for unpaid legal services relates to the plaintiff's representation of R.T. Services, Inc. and his receipt of checks from that corporation. The plaintiff alleges that the debtor falsely led him to believe that these checks would clear the company's bank account. The plaintiff does not charge the debtor with fraud in originally procuring his services for R.T. Systems, Inc., a corporation of which the debtor was chairman of the board and chief executive officer. The plaintiff's action is based upon the debtor's promise that the corporation would pay the plaintiff $25,000 on account of his unpaid legal bill if the plaintiff would step down as lead trial counsel in a pending jury trial. The plaintiff also charges that the debtor agreed to cause R.T. Systems, Inc. to issue a series of post-dated corporate checks in payment of the plaintiff's reduced legal bill of $135,000, which was done, but that the corporation never funded the bank account with the result that the checks were returned for insufficient funds.

■ The facts in this case amply support the liability of R.T. Systems, Inc. to the plaintiff for the legal services he performed for the corporation. However, the debtor, Daniel H. Overmyer, as chairman of the board and chief executive officer of the corporation, is not personally liable for the debtor's legal services. The main issue is whether the debtor's promise to have the corporation pay the plaintiff $25,000 on account of those services and his involvement in the issuance of a series of unfunded and post-dated corporate checks, all but three of which were signed by other corporate officers, in some way creates a personal nondischargeable liability on the part of the debtor. This point is answered in the negative.

■ Under the former Bankruptcy Act an individual's discharge was barred pursuant to § 14c(3) if such individual obtained money, property or credit for his corporation "while engaged in business ... as an executive of a corporation ... by making or publishing ... a materially false statement in writing respecting his financial condition or the financial condition of such ... corporation ...." The main purpose of this language was to refuse a discharge to a business person who issued a false financial statement. See *S.Rep. No. 1688,* 86th Cong.2d Sess. (1960), U.S.Code Cong. & Admin.News 1960, p. 2954. This provision was a codification of earlier case law which had evolved a concept known as the "indirect benefit doctrine" whereby a general discharge was not granted to such an individual if he had a substantial pecuniary interest in the corporation, somewhat akin to piercing the corporate veil. *Levy v. Industrial Finance Corp.,* 276 U.S. 281, 48 S.Ct. 298, 72 L.Ed. 572 (1928); *In re Marcus,* 253 F.2d 685 (2nd Cir.1958); *In re Bernstein,* 197 F.2d 378 (7th Cir.1952); *Wilensky v. Goodyear Tire & Rubber Co.,* 67 F.2d 389 (1st Cir.1933). However, the obtaining of legal services by means of fraud was excluded from this category as being neither money, property nor credit. *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1914). Therefore, under the former Bankruptcy Act, the obtaining of legal services by means of fraud would neither bar a discharge nor support a complaint to determine the nondischargeability of a debt. See *Gleason v. Thaw,* supra.

■ Under Code § 727 of the Bankruptcy Reform Act of 1978 the obtaining of money, property or credit by fraudulent means is no longer a ground for barring a discharge. However, these factors, together with a newly added item for fraudulently obtained services that was previously excluded under *Gleason v. Thaw,* supra, are now included in Code § 523(a)(2)(A) as a basis for determining the nondischargeability of a specific debt. Thus, there must first exist a debt owed by the debtor to the plaintiff in order for the plaintiff to obtain a determination that such debt is nondischargeable. An officer, director, or shareholder of a public corporation who repeatedly promises that the corporation will pay its debts does not thereby make those

debts his personal obligation. This is true because "[o]fficers and directors of a corporation are generally not liable for the debts of the corporation merely because they are officers or directors or are engaged in the active management of the corporation." *In re Penning,* 22 B.R. 616 at 618 (Bkrtcy.E.D. Mich.1982).

In light of the fact that the debtor, Daniel H. Overmyer, is not personally liable to the plaintiff for the latter's legal services performed for R.T. Systems, Inc., and that R.T. Systems, Inc. is liable to the plaintiff for such services, it follows that the plaintiff's complaint for a determination of nondischargeability as against the debtor is misdirected and must be dismissed.

■ As to the Elliot Realty Company transaction, for which the debtor is personally liable to the plaintiff, there was no proof that any of the debtor's promises of payment for the plaintiff's legal services had reference to any subject other than the plaintiff's services for R.T. Systems, Inc. Moreover, even if any of the debtor's promises of payment could be attributable to the Elliot Realty Company matter, they may not support a charge of nondischargeability as to that liability because a broken promise does not constitute a fraudulent misrepresentation without proof that the promissor never intended to perform when the promise was made. *In re Buttendorf,* 11 B.R. 558 (Bkrtcy.Vt.1981); *In re Jenes,* 18 B.R. 405 (Bkrtcy.S.D.Fla.1981); 3 *Collier on Bankruptcy,* ¶ 523.08, p. 523–45 (15th Ed.); 1 *Norton Bankruptcy Law and Practice,* § 27.41, F.N. 2, p. 63. In the *Buttendorf* case, supra, the court expressed this point as follows: (p. 562)

"The Plaintiff apparently also claims that the issuance of the checks for $18,-000.00 dishonored for insufficient funds constituted fraud. When these checks were delivered to the Plaintiff the Debtor represented that there would be funds available in the future for payment. As such there was no basis for actionable fraud. Neither representations of fact that will exist in the future nor mere promises, though false and intended to deceive, afford the basis of actionable fraud.

\* \* \* \* \* \* .

The issuance of worthless checks, absent a showing of moral turpitude or intentional wrong, will not defeat a discharge under Section 17(a)(2).

\* \* \* \* \* \*

Likewise it has been held that the issuance of worthless checks does not in itself prove an intent to defraud."

Similarly, the court in the *Jenes* case, supra said: (p. 408)

"The final question is whether the act of giving a check which is returned for insufficient funds, satisfies the requirement of fraud or false representations. The cases hold that simply issuing a worthless check to purchase goods does not in and of itself constitute fraud. There must be proven the intention to commit fraud or to mislead the other party beyond the mere giving of a check which is not paid. 'It must be conceded an obligation arising from property obtained by the issuance of worthless checks is *dischargeable* in bankruptcy unless the debtor was guilty of misrepresentation with intent to defraud in connection with the issuance of such checks.'" [Emphasis added].

There was no proof of any fraudulent intent on the debtor's part as to the Elliot Realty Company matter.

### CONCLUSIONS OF LAW

1. R.T. Systems, Inc. is liable to the plaintiff for legal services performed for that corporation and not the debtor, who is not personally indebted to the plaintiff for such services.

2. The plaintiff's complaint for a determination of nondischargeability as to the liability for his legal services for R.T. Systems, Inc. by reason of fraudulent misrepresentations by the debtor must be dismissed because the debtor is not personally liable to the plaintiff for such services.

3. The complaint seeking a determination of nondischargeability of the debtor's

obligation for the plaintiff's legal services for the debtor, personally, in connection with the Elliot Realty Company matter must be dismissed for lack of proof as to any fraudulent conduct on the part of the debtor.

SUBMIT ORDER on notice.